**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MASHALLAH, INC., an Illinois Corporation and RANALLI'S PARK RIDGE, LLC d/b/a HOLT'S, | ) ) ) | Case No. 20-cv-05472 |
| Plaintiffs, | ) ) ) | Hon. |
| v. | ) ) | |
| WEST BEND MUTUAL INSURANCE COMPANY, a Wisconsin Corporation, | ) ) ) | JURY TRIAL DEMANDED |
| Defendant. | ) ) ) | |

**COMPLAINT**
**(INCLUDING CLASS ACTION COMPLAINT PLED IN THE ALTERNATIVE)**

Plaintiffs Mashallah, Inc. ("Mashallah") and Ranalli's Park Ridge, LLC d/b/a Holt's

("Ranalli", Mashallah and Ranalli are collectively, "Plaintiffs") by and through its attorneys, Fuksa

Khorshid, LLC, and on behalf of all those similarly situated (with respect to Counts IV and V

seeking a rebate of premium on behalf of a Nationwide Class, in the alternative under Fed. R. Civ.

P. 8(d)(2) and (3)), states and alleges its Complaint against West Bend Mutual Insurance Company

("Defendant" or "Defendant West Bend") as follows:

**NATURE OF THE ACTION**

1.      Plaintiff Mashallah is a small business – a jewelry label offering unique,

handcrafted jewelry from its Chicago-based designer, Mashallah Ghouleh.

2.      Plaintiff Ranalli is also a small business, operating as a successful bar & restaurant

known as "Holt's" in Park Ridge, Illinois.

3.      Plaintiffs assert claims for business interruption insurance coverage under "all-risk"

commercial property insurance issued and sold to them by the Defendant West Bend.  Under

1

longstanding and bedrock principles of insurance law, Plaintiffs are entitled to payment under those policies for business income losses suffered as a direct result of state, municipal and local executive shutdown orders and restrictive executive reopening orders ("Closure Orders") that caused direct physical loss or damage to their properties by physically impairing, detrimentally altering, and rendering them nonfunctional or only partially functional as the businesses and institutions they formerly were.

4.      Prior to the Closure orders, Plaintiffs' businesses were vibrant, bustling and successful.  But the Closure Orders brought an end to all of that activity by imposing direct physical restrictions that impaired Plaintiffs' properties and rendered them nonfunctional for their intended purposes. By altering the physical premises – all of which are critical to Plaintiffs operations – their establishments were materially and detrimentally altered by the Closure Orders. Under the Closure orders, Plaintiffs had to close or block off sections of their physical space, create or install barriers, manipulate fixtures and other equipment into nonfunctional arrangements, place physical markers on floors and walls, and redesign routes for entrance and egress.  Vast amounts of square footage in their space – many painstakingly designed to maximize the customer's experience and the business' revenues – were lost, detrimentally altered, and rendered nonfunctional for their intended purposes.

5.      To protect their businesses from risk, Plaintiffs each purchased their own "Commercial Lines Policy" from Defendant West Bend Mutual Insurance Company.  These 100+ page policy contracts were authored and issued by Defendant and contain numerous promises to pay Plaintiffs – also known as "coverages" – for a broad range of losses that the Plaintiffs might suffer, including business interruption.  A true and correct copy of Mashallah's Commercial Lines Policy (the "Mashallah Policy") is attached hereto as Exhibit A and incorporated by reference herein.  A true and correct copy of Ranalli's Commercial Lines Policy (the "Ranalli Policy" is

attached hereto as <u>Exhibit B</u> and incorporated by reference herein. The Mashallah Policy and Ranalli Policy may be collectively referred to as the "Policies."

6.      At the time Defendant underwrote and sold the Policies, it understood and expected that it would be insuring these properties as fully functioning and operational businesses. Defendant knowingly calculated Plaintiffs' business interruption and commercial insurance premiums based in material part on the revenue they expected Plaintiffs to generate as fully-functioning and operational businesses, and the risk Plaintiffs take on as fully-functioning and operational businesses. Defendant is fully aware that Plaintiffs' businesses and properties have been physically impaired by the Closure Orders and that Plaintiffs have lost the means to generate that revenue – *i.e.*, that Plaintiffs have suffered direct physical loss of and damage to their insured properties. Defendant is fully aware that with no operations or partial operations, a universe of risks for which they would pay business interruption and other claims are now mitigated or entirely absent. A shuttered kitchen (for example) has no fires. When (for example) bars, retail floors and beauty parlors have no customers (or customers limited to fractional capacity) there are no or fewer other kinds of claims under the Policies. Defendants' claims payout records since March 1, 2020 (and compared to prior years) will bear out that they have saved. Yet Defendant has continued to charge and accept full premium payments from Plaintiffs as if their insured properties remained fully functional and operational. This is the basis for an unjust enrichment claim against the Defendant, which must be upheld in the event that coverage is denied. This unjust enrichment claim is pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2) and (3) on behalf of a Fed. R. Civ. P. 23(b)(1) and (3) Nationwide Class of West Bend's policyholders whose businesses were in any manner impaired or constrained by closure orders, and is found in Count VI. This same misconduct also supports a claim (Count V) by Plaintiffs and the Nationwide Class for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*

("ICFA") and the similar laws of other states where Defendant sells insurance.

7.     Stated in plain terms, Defendant can't "have its cake and eat it too" – either it needs to pay Plaintiffs on business income losses they sustained due to their Closure Orders, or, if West Bend prevails against coverage, then these Plaintiffs and all others similarly situated in a Nationwide Class must receive a rebate of premium for the windfall that West Bend kept for itself by reduced claims due to Closure Order shutdowns, partial operations mandates and other constraints.  This is a prime example of why Fed. R. Civ. P. 8(d)(2) and (3) exist to render complete justice to the aggrieved. As set out in Counts IV and V, this premium rebate claim is eminently appropriate for class adjudication, and these are claims Defendant must face if it prevails on its arguments against coverage.

8.     Despite the fact that Defendant has accepted Plaintiffs' insurance premium payments, Defendant has summarily denied Plaintiffs' claims for coverage arising from government-ordered interruption and closure of their respective businesses, in breach of Defendant's contractual obligations under the Policies.  Defendant denied Plaintiffs' claims with a cursory boilerplate letter sent (on information and belief) in substantially similar form to all of Defendant's insureds, without any reasonable explanation or individualized investigation or consideration. A true and correct copy of this form denial letter for Mashallah is attached hereto as Exhibit C and incorporated by reference herein.  A true and correct copy of this form denial letter for Ranalli is attached hereto as Exhibit D and incorporated by reference herein.

9.     Significantly, Defendant admits to both Plaintiffs in its form denial letter that: *"your policy of insurance provides broad protection for your business."* (emphasis added) (Exhibit C/ Mashallah Denial Letter  p. 1) (*See also*, Exhibit D/ Ranalli Denial Letter, p. 2).

10.    As Defendant West Bend is well aware, "all risk" commercial property policies cover all possible risks of any kind or description, unless specifically excluded. Unlike

"enumerated perils" property insurance, which covers only specified causes of loss, all-risk property insurance provides business insureds with the comfort of knowing that even unprecedented and unanticipated risks of loss are covered. Due to the breadth of coverage, Plaintiffs paid a substantial premium for this type of insurance. Here, the Closure Orders are clearly within the scope of "all risks" covered by the Policies. This basis for coverage is referred to herein as the "Closure Order Basis for Coverage" and is one of two major theories of coverage alleged by the Plaintiffs herein. Fed. R. Civ. P. 8(d)(2), (3).

11.     As set forth at length herein, Plaintiffs have been forced to file this action for a declaratory judgment in response to Defendant's misconduct and refusal to meet its obligations under the Policies, in order for this Court to establish that Plaintiffs are entitled to receive the benefit of the insurance coverage they purchased. Plaintiffs seek reimbursement and indemnification of the business losses they have each sustained, as well as all damages arising out of Defendant's breach of contract and Defendant's bad faith claims handling under 215 ILCS 5/155. As pled in more detail herein, Plaintiffs pose two major bases for coverage, one of which is known as the "Closure Order Basis for Coverage" and the other of which is the "Scientific Basis for Coverage." Fed. R. Civ. P. 8(d)(2), (3). Finally, Plaintiffs also assert a Nationwide Class action claim for unjust enrichment, in the alternative, as set out in Count IV.

## THE PARTIES

12.     Plaintiff Mashallah is a corporation organized and existing under the laws of Illinois with its principal place of business at 1840 S. Halsted Street, Suite 1F, Chicago, Illinois 60608, located in Cook County and in the Northern District of Illinois. Mashallah conducts all of its business operations in Illinois.

13.     Plaintiff Ranalli is a limited liability company, organized and existing under the laws of Illinois with its principal place of business at 43 S. Prospect Ave., Park Ridge, Illinois

60068, located in Cook County and in the Northern District of Illinois. Ranallli conducts all of its business in Illinois.

14.     Defendant West Bend Mutual Insurance Company is a Wisconsin insurance company organized and existing under the laws of Wisconsin with its principal place of business at 1900 S 18th Ave, West Bend, Wisconsin 53095.  Defendant is registered with the Illinois Department of Insurance to conduct business in Illinois. Defendant specializes in both commercial and personal lines of insurance.

## JURISDICTION AND VENUE

### *Subject Matter Jurisdiction*

15.     This Court has federal subject matter jurisdiction over the claims set forth in this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

16.     Plaintiff Mashallah is incorporated in and has its principal place of business in Illinois.  Accordingly, Plaintiff is a citizen of Illinois. Similarly, Plaintiff Ranalli is organized in and has a principal place of business in Illinois. Ranalli's members are Matthew Ranalli and he is domiciled in Illinois. Accordingly, Ranalli and its members are citizens of Illinois.

17.     West Bend Mutual Insurance Company is incorporated in and has its principal place of business in Wisconsin.  Accordingly, West Bend Mutual Insurance Company is a citizen of Wisconsin.

18.     The amount in controversy between Mashallah and West Bend in this action is well in excess of $75,000.  Plaintiff Mashallah is entirely shut down and is losing business income at an increasing rate. As of the date of filing of this action, Plaintiff Mashallah has sustained approximately $68,000 in business income losses that continue to mount.  Additionally, as set forth in Count III below, Mashallah makes a claim for statutory bad faith under 215 ILCS 5/154.6, which

entitles Mashallah to statutory penalties and attorneys' fees of an additional $50,000 or more as of the time of filing of this action. Therefore, the amount in controversy in this action at time of filing is well in excess of $115,000 for Mashallah.

19.     The amount in controversy between Ranalli and West Bend in this action is also well in excess of $75,000. Plaintiff Ranalli is entirely shut down and is losing business income at an increasing rate of approximately $100,000 per month. (Ranalli's has suffered losses of approximately $90,000 in March, 2020, $126,000 in April, 2020, and $150,000 in May, 2020.) As of the date of filing of this action, Plaintiff Ranalli has sustained approximately $430,000.00 in business income losses that continue to mount. Additionally, as set forth in Count III below, Ranalli also makes a claim for statutory bad faith under 215 ILCS 5/154.6, which entitles Plaintiff to statutory penalties and attorneys' fees of an additional $50,000 or more as of the time of filing of this action. Therefore, the amount in controversy in this action at time of filing is well in excess of the jurisdictional threshold as it approaches a half of a million dollars.

20.     This Court also has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) because Counts IV and V allege class action claims where "any member of a class of plaintiffs is a citizen of a state different from any defendant and the aggregated amount in controversy exceeds $5,000,000, exclusive of interest and costs." Plaintiffs are informed and believe that Defendant wrote over $1 billion in commercial insurance premiums for 2019, so a premium rebate of less than ½ of one percent would fulfill this amount in controversy.

### Personal Jurisdiction

21.     The Court may exercise general personal jurisdiction over Defendant due to the fact that Defendant's activities in Illinois are such that Defendant may fairly be regarded as submitting itself to jurisdiction of the courts in Illinois. Defendant exercises substantial, systematic and

continuous contacts with Illinois by doing business in Illinois, serving insureds in Illinois, and seeking additional business in Illinois.

22.     The Court may exercise specific personal jurisdiction over Defendant in this matter, as Plaintiffs' claims arise out of Defendant's activities in Illinois.

23.     Further, Defendant has submitted to jurisdiction in the Northern District of Illinois pursuant to the Illinois "long arm statute," 735 ILCS 5/2-209, by: (a) transacting business in Illinois; (b) contracting to insure a person, property or risk located within this district at the time of contracting; and (c) making a contract substantially connected with this district and Illinois. *See* 735 ILCS 5/2-209(1), (4), (7).

24.     This Court has jurisdiction to grant declaratory relief under 28 U.S.C. § 2201 because an actual controversy exists between the parties as to their respective rights and obligations under the insurance Policy concerning Plaintiffs' loss of business arising from the Closure Orders.

*Venue*

25.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendant is a resident in this district by virtue of being subject to the court's personal jurisdiction with respect to this action.

26.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

**FACTS**

27.     Mashallah is a socially-conscious jewelry brand that makes timeless jewelry with a mission to uplift those in need. Mashallah works with artists around Chicago and across the country to bring passions projects to life which are then displayed in Mashallah's brick and mortar

store in Pilsen, Chicago's Art District. Mashallah's physical location helps connect the company, and its collaborating artists, to a wider audience. Mashallah is deeply devoted to the community, hiring and mentoring college students majoring in fine arts and marketing. Mashallah's store in Chicago's Pilsen neighborhood was and remains closed, with its operations entirely suspended or greatly restricted as of the date of filing of this action.

28. Ranalli operates a successful bar and restaurant known as "Holt's" in the City of Park Ridge, Illinois. Since 2015, Ranalli has been a staple of the community offering an exquisite menu which can be paired with an array of craft beers. Ranalli's offers its customers an upscale atmosphere and superb service where friends and families could gather in downtown Park Ridge. The nature of Ranalli's business requires the utilization of its physical business premises where the vast majority of its food, beverage, and liquor revenues are generated. Restaurants such as Holt's rely heavily on in-person dining, including beer and liquor sales, which requires direct personal contact with its customers. Ranalli's restaurant operations were brought to an immediate halt, restricted to takeout and delivery orders which comprise a fraction of Ranalli's monthly revenue.

### **The Policies and the Coverages**

#### ***The Mashallah Policy***

29. Like many other reputable and honest small businesses, Mashallah and Ranalli each conducted their respective businesses responsibly and obtained what is known in business and the insurance industry as a "Commercial General Liability" or "CGL," and "all risk" policy to protect themselves and others from a myriad of risks.

30.     Defendant aggressively markets and sells CGL policies, advertising such policies as designed as a way for businesses to be "smart" and to play a key part of the "Silver Lining" Defendant promises in the event of a loss.[1]

31.     Plaintiff Mashallah purchased its West Bend Commercial Lines Policy through an agent of West Bend, CS Insurance Strategies, Inc., located at 150 N. Michigan Ave. #2400, Chicago, IL 60601.  The Mashallah Policy was effective August 1, 2019 through August 1, 2020 and was a renewal of an identical or practically identical policy in force the year before.  Plaintiff Mashallah paid a premium to Defendant for the coverages in this Policy.  (Ex. A).

32.     The Mashallah Policy is what is known in the insurance industry as an "all risk" policy that provides broad coverage for losses sustained from *any cause*.  As Defendant itself states and admits, the Mashallah Policy provides "broad protection for your business" (Ex. C, p. 1).

33.     In the Policy, Defendant promised to pay Plaintiff for "actual loss of Business Income you sustain due to the necessary suspension of your 'operations'" when Plaintiff experienced a "direct physical loss of" or damage to its business premises.  (Ex. A/ Mashallah Policy at p. 6 of 53, p. 7 of 53).

34.     Defendant further promised in the Mashallah Policy to pay Plaintiff Mashallah for "actual loss of Business Income you sustain . . . caused by action of civil authority that prohibits access" to Plaintiff's business premises, provided that Plaintiff's premises are "not more than one mile" from other "damaged property" and the civil authority order is in response to "dangerous physical conditions."  (Ex. A/ Mashallah Policy, p. 9 of 53).

---

[1]     West Bend Mutual Insurance Company, https://www.thesilverlining.com/business-insurance/insurance-for-your-business (accessed April 14, 2020).

35. In the Mashallah Policy, Defendant promised to provide Mashallah with broad coverage for lost "business income" plus "extra expense" sustained during periods of shutdown and beyond. (Ex. A/ Mashallah Policy p 9 of 53).

36. Although the Mashallah Policy contained a purported "Virus or Bacteria" exclusion (Ex. A/ Mashallah Policy at p. 20 of 53), said exclusion is impermissibly overbroad and unenforceable. Moreover, it introduces ambiguities into the Mashallah Policy that must be construed against West Bend.

### *The Ranalli Policy*

37. Plaintiff Ranalli purchased its West Bend Commercial Lines Policy through an agent of West Bend, Presidio, located at 55 Shulman Blvd, Suite 900, Naperville, IL 60563. The Ranalli Policy was effective October 8, 2019 through October 8, 2020 and was a renewal of an identical or practically identical policy in force the year before. Plaintiff Ranalli paid a premium to Defendant for the coverages in this Policy. (Ex. B).

38. The Ranalli Policy is also what is known in the insurance industry as an "all risk" policy that provides broad coverage for losses sustained from *any cause*. As Defendant itself states and admits, the Ranalli Policy provides "broad protection for your business" (Ex. D/ Ranalli Denial Letter, p. 2).

39. In the Ranalli Policy, Defendant promised to pay Plaintiff Ranalli for "actual loss of Business Income you sustain due to the necessary suspension of your 'operations'" when Ranalli experienced a "direct physical loss of" or damage to its business premises. (Ex. B/ Ranalli Policy "Bus. Income Coverage Form" p. 2 of 9).

40. Defendant further promised in the Ranalli Policy to pay Ranalli for "actual loss of Business Income you sustain . . . caused by action of civil authority that prohibits access" to Ranalli's business premises, provided that Plaintiff's premises are "not more than one mile" from

11

other "damaged property" and the civil authority order is in response to "dangerous physical conditions." (Ex. B/ Ranalli Policy "Bus. Income Coverage Form" p. 2 of 9).

41.    In the Ranalli Policy, Defendant promised to provide Ranalli with broad coverage for lost "business income" plus "extra expense" sustained during periods of shutdown and beyond. (Ex. B/ Ranalli Policy "Bus. Income Coverage Form" p. 1 of 9).

42.    Although the Ranalli Policy contained a purported "Virus or Bacteria" exclusion (Ex. B/ Ranalli Policy, "Exclusion of Loss due to Virus or Bacteria" Form p. 1 of 1), said exclusion is impermissibly overbroad and unenforceable. Moreover, it introduces ambiguities into the Ranalli Policy that must be construed against West Bend.

**Defendant's Systematic Denial of Claims**

43.    Despite Defendant's promises in the Policies to pay for lost business income and extra expenses incurred by Plaintiffs in circumstances such as these, Defendant has denied all such claims.

44.    Defendant's response contrasts its promises on its website that it "Provides a Silver Lining" and that "[t]he worst brings out our best,"[2] Defendant's "COVID-19 Resources" page merely directs insureds, such as Plaintiffs, to government relief programs without even acknowledging, let alone honoring, its obligations under thousands of policy contracts during the current crisis. All the while, Defendant is retaining, enjoying, and investing the premium / claims payment windfall it has achieved from profoundly lower commercial policy claims by its commercial insureds (members of the Nationwide Class) whose businesses are shuttered or reduced in operations by Closure Orders.

45.    Rather than "[t]he worst brings out our best," Defendant's approach to these

---

[2] West Bend Mutual Insurance Company, https://www.thesilverlining.com/ (accessed April 14, 2020).

insurance claims has been to leave its insureds, the taxpayers, and society as a whole to bear the economic burden of West Bend's refusal to honor its own obligations under its policies. And Defendant's portfolio managers have been strategically investing the resulting windfall.

46.     Defendant has designed and executed, in bad faith, a systematic and consistent form and cursory denial of all claims, such as Plaintiffs' claims, in order to avoid paying Defendant's obligations under the Policies. After making their respective claims, Plaintiffs each received Defendant's cursory, form denial letter (Exs. C & D) which are near identical to one another and which Plaintiffs believe are identical in substance and form to thousands of other letters Defendant has sent out to any and every insured who has made or will make a claim for losses sustained during the current crisis.

47.     West Bend failed to undertake or conduct a reasonable investigation of either of Plaintiffs' claims under their respective Policies, in violation of its duties under Illinois law.

48.     Defendant's denials to Plaintiffs were not only woefully inadequate, but were based on the false and blanket assertion that because the "shut down and suspension of operations is a result of a virus, the above exclusion applies to this situation." (Ex. C/ Mashallah Denial, p. 2; Ex. D/ Ranalli Denial, p. 3). Notably, West Bend's denial letters to Plaintiffs did not conclude that there was no direct physical loss or damage to property at Plaintiffs' premises. In other words, Defendant has not denied that Plaintiffs' premises suffered a direct physical loss, only that such loss is excluded due to an overly broad application of a virus exclusion. As set forth herein, that blanket assertion runs contrary to Illinois law, established science, and the facts.

### Federal Rule of Civil Procedure 8(d) Permits Alternative Pleading

49.     The Federal Rules of Civil Procedure embody public policy and the mandate of law that parties may both plead in the alternative, and state as many separate claims (or defenses) as they may have, regardless of consistency:

13

Rule 8. General Rules of Pleading
. . .
(d) Pleading to Be Concise and Direct; Alternative Statements; Inconsistency.
. . .
(2) Alternative Statements of a Claim or Defense. A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.
(3) Inconsistent Claims or Defenses. A party may state as many separate claims or defenses as it has, regardless of consistency.

50.     Plaintiffs proffer in this case two fundamental, alternative bases for coverage: 1) **the Closure Order Basis for Coverage;** and 2) **the Scientific Basis for Coverage**.  Rule 8 permits, indeed mandates, that Plaintiffs may proceed with these alternative theories in the pursuit of justice.

### The Closure Order Basis for Coverage

51.     A bedrock principle of Plaintiffs' case is that the Closure Orders caused direct physical loss and/or damage to their properties.  While Defendant will contend in defense that Plaintiffs did not sustain "direct physical loss" or "damage to" property within the meaning of their Policies, the evidence at trial will show that the Closure Orders did cause direct physical loss of and damage to Plaintiffs' properties.  Under any reasonable construction, the phrase "direct physical loss of or damage to" property is broad and would include detrimental physical effects which alter and impair the functioning of the tangible, material dimensions of property—especially where, as here, property is rendered nonfunctional for its intended purpose due to the altered appearance, shape, and other material aspects of the property. That is precisely the type of loss and damage caused by the Closure Orders.

52.     Defendant chose not to define the terms "direct physical loss" or "damage" in the Policies, nor did it define "direct physical damage" or "physical damage." Instead, Defendant

14

intentionally left each of these terms undefined—even though it knew, or should have known, that these terms can reasonably be construed, and indeed have been construed by courts, more broadly than the narrow self-serving definition that they contend should provide the terms only meaning. As undefined terms in the Policies, each of these terms must be given its plain and ordinary meaning consistent with the knowledge and expectations of an ordinary, reasonable insured.

53.     In the Policies, "loss" is used in the alternative to "damage." Thus, there is coverage provided for both "loss" and "damage," either alternatively or collectively, because "loss" coverage is different from, and in addition to, "damage" coverage. Property "loss" refers to, among other things, being deprived of a property's function, while "damage" refers to, among other things, the impairment of property or a reduction in its functionality. The adjective "physical," among other things, distinguishes between the tangible, material aspects of an object and those that are purely intangible, such as sentiment, emotion, or imagination. In addition, under a plain grammatical reading of the phrase "direct physical loss of or damage to" property (or "direct physical loss or damage to" property), the words "direct" and "physical" can be reasonably construed as modifying only "loss" coverage—not "damage" coverage. To the extent that any language in the Policies is ambiguous, it should be construed against Defendant and in favor of coverage.

54.     Here, the Closure Orders caused both property loss and property damage by directly, physically impairing the functionality of Plaintiffs' property and dispossessing Plaintiffs of their tangible spaces. Dining rooms, bars, or sales floors closed, areas blocked off, barriers erected, appearances altered, furniture moved, fixtures altered, spaces shuttered, floors marked, plexiglass mounted—these are but some examples of the direct physical loss and damage Plaintiffs' properties have incurred.

55.     Each of the Plaintiffs understood, expected, and believed that their Policies would cover the direct physical loss of or damage to their property that they suffered as a direct result of the Closure Orders. This understanding and expectation are both subjectively and objectively reasonable. Defendant cannot now redefine or narrow the meaning of physical loss or damage— or any other undefined terms in the Policies—to support a denial of coverage in these unprecedented circumstances.

56.     Because there is a reasonable construction of these terms that provides coverage to Plaintiffs for their business interruption claims—and based on bedrock insurance law principles requiring policy terms to be construed broadly in favor of coverage for Plaintiffs—Defendant must pay Plaintiffs' claims.

57.     Although the Policies contain purported "Virus or Bacteria" exclusions, those exclusions do not and cannot function as against claims for physical loss and damage caused by Closure Orders, not by a virus. Any other reading of such an exclusion is impermissibly overbroad and unenforceable.

**The Scientific Basis for Coverage**

58.     Reports of a novel Coronavirus ("COVID-19") pandemic emerged out of Wuhan, China in early 2020. The first case in the United States was confirmed on January 20, 2020, followed rapidly by many others, culminating in a medical and economic disaster.[3]

59.     By March 15, 2020, Illinois Governor J.B. Pritzker, exercising his emergency powers under state law, ordered many public gathering places closed in an effort to slow or stop the spread of COVID-19. On March 20, 2020, Governor Pritzker ordered all "non-essential businesses" to close. Similar orders were issued by Chicago Mayor Lori Lightfoot pursuant to her

---

[3] New England Journal of Medicine, March 5, 2020
https://www.nejm.org/doi/full/10.1056/NEJMoa2001191.

emergency powers under state law. Many similar orders have followed, all prohibiting or severely curtailing the use of business property and premises.

60.     Illinois law, science, and the facts contradict Defendant's arguments against coverage. Illinois courts have held that dangerous substances can and do cause "direct physical loss or damage" under commercial insurance policies. *See e.g.*, *Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Int'l Ins. Co.*, 720 N.E.2d 622, 625–26 (Ill. App. Ct. 1999), *as modified on denial of reh'g* (Dec. 3, 1999).

61.     COVID-19 may well be the most dangerous physical substance to emerge upon humankind to date during the 21st century. The danger of the presence of COVID-19 on a surface or in the air at a premises renders that premises potentially fatal and directly physically affected, damaged, and unfit for human use. Like asbestos, COVID-19 can linger in the air or on surfaces (including equipment and air ducts on a business premises) and endanger human life. Unlike inanimate asbestos, COVID-19 can reproduce readily and expand its direct physical impact by infecting areas and persons quickly. Unlike inanimate asbestos (but just like a spreading fire), its direct physical impact cannot be encapsulated or contained on a premises. At the same time, there are no readily available and easy to administer tests to determine if COVID-19 exists on a property and no vaccine to slow or stop its spread, meaning its physical presence has a profoundly dangerous impact.

62.     West Bend essentially argues that because COVID-19 cannot be seen with the naked eye or is "invisible," that it can have no direct physical impact.

63.     COVID-19 physically exists.

64.     COVID-19 has a direct physical impact.

65.     COVID-19 alters property in appearance, shape, color, or other material dimension.

66. COVID-19 can be seen with an electron microscope to alter property in appearance, shape, color, or other material dimension.[4]

67. This is an electron microscope image[5] of COVID-19 that depicts its physical existence:



68. West Bend's arguments against coverage that COVID-19 causes a direct physical loss or damage to property (Ex.) rejects the germ theory of disease proven more than a century ago

---

[4]      https://www.sciencealert.com/this-is-what-the-covid-19-virus-looks-like-under-electron-microscopes

[5]      https://www.sciencealert.com/this-is-what-the-covid-19-virus-looks-like-under-electron-microscopes

by Louis Pasteur (1864). The germ theory of disease states that microscopic pathogens, which include viruses, too small to see without magnification, do physically exist. Due to their physical existence, viral pathogens can move from the physical environs of property, invade humans and other living hosts, and cause fatal disease.

69. Emerging research and recent reports from the CDC indicate that the COVID-19 pathogen strains physically impact and infect and can stay alive on surfaces for at least 17 days.[6] Thus, a core scientific and epidemiological concept of the Closure Orders (and the loss of business property they mandate) is the necessary assumption that COVID-19 is physically and impactfully present on the surface of every premises and will be transmitted, resulting in harm and/or death.[7] This science is fundamental to the Closure Orders.[8]

70. Government authorities on the federal, state, and local levels, including those in the jurisdiction in which the Plaintiff is located, have based their orders on the scientifically supported presumption that COVID-19 exists at all business premises.[9]

71. Government authorities issued Closure Orders that mandated the shutdown of Plaintiffs' businesses.

72. The complete shutdown of non-essential businesses, social distancing rules, mandatory masks, partial suspensions of other businesses, and many other elements underscore

---

[6]   https://www.cnbc.com/2020/03/23/cdc-coronavirus-survived-in-princess-cruise-cabins-up-to-17-days-after-passengers-left.html

[7] Centers for Disease Control and Prevention, *Social Distancing, Quarantine and Isolation*, Coronavirus Disease 2019 (COVID-19) (April 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html; Harlan M. Krumholz, *If You Have Coronavirus Symptoms, Assume You Have the Illness, Even if You Test Negative*, The New York Times (April 1, 2020), https://www.nytimes.com/2020/04/01/well/live/coronavirus-symptoms-tests-false-negative.html.

[8] *When Could Things Reopen? How each State is Responding to COVID-19*, National Public Radio (April 9, 2020), https://www.npr.org/2020/03/12/815200313/what-governors-are-doing-to-tackle-spreading-coronavirus.

[9] *COVID-19 Expert Reality Check*, John Hopkins Bloomberg School of Public Health (April 6, 2020), https://www.globalhealthnow.org/2020-02/coronavirus-expert-reality-check.

the scientific and governmental assumption that COVID-19 has a direct physical impact on premises everywhere. While economically devastating, this precept is a common theme to all of the Closure Orders in the United States.[10] The Closure Orders aim to save lives by "flattening the curve."[11]

73.     West Bend's arguments against coverage that a virus cannot cause direct physical loss or damage are contrary to well-established and peer-reviewed science developed and accepted over the past 156 years.  West Bend's arguments also ignore current, cutting-edge science about COVID-19 that is saving lives in America today.

74.     West Bend failed to investigate, consider or even attempt to understand the scientific reasoning and basis of the Closure Orders, with which Plaintiffs were required to comply, leading directly to Plaintiffs' business income and other losses.

75.     In discovery and at trial, Plaintiffs will present scientific evidence to support that COVID-19 causes a direct physical impact (including altering property in one or more of "appearance, shape, color or other material dimension") and to enable to jury to justly and fairly determine the controversies created by West Bend's coverage positions and denials.  *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

**Defendant Owes Business Income Loss Coverage**

76.     Plaintiffs suffered a complete loss of and damage to their business premises under the Closure Orders. Plaintiff Mashallah suffered a direct physical loss and damage to its jewelry store and gallery and the business premises that enabled it to provide products and services.

---

[10] Harvey V. Fineberg, *Ten Weeks to Crush the Curve*, New England Journal of Medicine (April 1, 2020), https://www.nejm.org/doi/full/10.1056/NEJMe2007263?query=featured_coronavirus.
[11] Kathy Katella, *5 Things Everyone Should Know About the Coronavirus*, Yale Medicine (April 13, 2020), https://www.yalemedicine.org/stories/2019-novel-coronavirus/.

Plaintiff Ranalli also suffered a direct physical loss and damage to its bar and restaurant and its entire business premises that enabled it to provide its services.

77.     Under well-accepted legal and scientific principles sustained "a direct physical loss of or damage to" property at the described premises, Defendant owes coverage for the resulting Business Income losses under **both** the Mashallah Policy and Ranalli Policy. (Ex. A/ Mashallah Policy p. 6 of 53; Ex. B/ Ranalli Policy p. 1 of 9).

### Defendant Owes Civil Authority Coverage

78.     In the alternative, Fed. R. Civ. P. 8(d), the Closure Orders were an "action of civil authority" that prohibited Mashallah and Ranalli "access to the described premises" to use for their respective business purposes. (Ex. A/ Mashallah Policy p. 9 of 53; Ex. B/ Ranalli Policy 2 of 9). Thus, Plaintiffs suffered a complete loss of access to their business premises under the Closure Orders.

79.     Because the Closure Orders prohibited access to every "non-essential" business in Illinois, "access to the area immediately surrounding" a "damaged property" was prohibited by governmental order encompassing many locations. (Ex. A/ Mashallah Policy p. 9 of 53; Ex. B/ Ranalli Policy 2 of 9).

80.     Moreover, the Closure Orders were a response to "damaged property" with dangerous physical conditions threatening to human life within one mile of Plaintiffs' businesses.

81.     Mashallah is located at 1840 S.Halsted Street in Chicago, and therefore less than a mile from COVID-19 testing site – Alivio Medical Center – located at 966 W. 21st St., Chicago. Mashallah's business premises are also approximately two miles away from Rush Medical Center located at 1740 W. Taylor St., Chicago and John H. Stroger Hospital located at 1969 S. Ogden Ave., Chicago.

82.    This proximity of Mashallah's premises to a COVID-19 testing site as well as two major hospitals, where persons suffering (and on information and belief, dying) from COVID-19 were located, is just one among many facts that West Bend would have discovered had it properly investigated Mashallah's claims before making its form denials.[12]

83.    Additionally, Ranalli's is located at 43 S. Prospect Ave. in Park Ridge, Illinois, and therefore is within less than a mile of several nursing or medical facilities (including, among others, Summit of Uptown and Nova Care Rehabilitation), in Park Ridge.

84.    COVID-19 can also spread on particulate matter in the air.  Both of Plaintiffs' business premises are in urban areas with pollution in the air.[13]  As a result, COVID-19 was spread throughout other locations within one mile of Plaintiffs' premises.[14]

85.    Therefore, Plaintiffs have sustained business income losses:  a) by action of civil authority prohibiting access to its hair salon; b) because of dangerous COVID-19 within an area of a mile (if not on Plaintiffs' actual premises), and c) as a result of COVID-19 creating a dangerous physical condition to which civil authority responded, Defendant owes coverage to both Plaintiffs under their respective Civil Authority Coverages.  .  (Ex. A/ Mashallah Policy p. 9 of 53; Ex. B/ Ranalli Policy 2 of 9).

---

[12] According to Google, of which this Court can take judicial notice, the distance is 0.5 mile. https://www.google.com/search?q=2658+North+Halsted+Street%2C+Chicago%2C+IL+to+836 +W+Wellington+Ave%2C+Chicago%2C+IL+60657&rlz=1C1GGRV_enUS748US748&oq=26 58+North+Halsted+Street%2C+Chicago%2C+IL+to+836+W+Wellington+Ave%2C+Chicago% 2C+IL+60657&aqs=chrome..69i57.5226j0j7&sourceid=chrome&ie=UTF-8
[13]        https://www.usatoday.com/story/news/health/2020/04/27/coronavirus-found-air-pollution-particles-preliminary-study-finds/3033646001/
[14] https://www.chicagotribune.com/coronavirus/ct-viz-covid-19-cases-by-zip-code-20200407-aikakoyycje4fbqvferzjffkg4-htmlstory.html

**Defendant's Purported Virus Exclusion Fails**

86.     To the extent that Defendant may attempt to rely on a purported virus "exclusion" in its Policy (Ex. A., p. 35 of 45; Ex. B. p. 2), that exclusion is ineffective for numerous reasons.

87.     As alleged above, under the Closure Order Basis for Coverage this exclusion does not and cannot function as against claims for physical loss and damage caused by Closure Orders, not by a virus. Any other reading of such an exclusion is impermissibly overbroad and unenforceable.

88.     Even if a virus exclusion were somehow enforceable, it must be narrowly construed under Illinois law. The following illustrate a non-exclusive list of why Defendant's purported virus exclusion fails as to all theories of coverage, including the Scientific Basis for Coverage:

   a.   "It is the insurer's burden to affirmatively demonstrate the applicability of an exclusion." *Pekin Insurance Co. v. Miller*, 367 Ill. App. 3d 263, 267 (Ill. App. Ct. 2006).

   b.   When an insurer relies upon exclusionary policy language to deny or limit coverage, the language's application to the facts must be clear and free from doubt. *Cohen Furniture Co. v. St. Paul Insurance Co. of Illinois*, 214 Ill. App. 3d 408, 412–13 (Ill. App. Ct. 1991). The language here is neither clear nor free from doubt given the language of the policy granting broad and numerous coverages, including for virus, when weighed against the facts and science and all of the issues put into contention by the Closure Orders compelling Plaintiff's shutdown, and Defendant's factual denials that any of this presents "direct physical loss or damage."

   c.   In situations where insurance policy language is ambiguous or uncertain, then that language must be construed in favor of the insured and against the insurer who wrote the policy language at issue. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 108-09 (Ill. 1992).

   d.   When a question arises as to coverage where more than one cause contributed to a loss, some of which are covered and some of which may be excluded under a policy, courts will narrowly construe the exclusion language, as it is in derogation of coverage. *Bozek v. Erie Insurance Group*, 46 N.E.3d 362, 368 (Ill. App. Ct. 2015).

89.     Here, the factual and scientific evidence to be presented at trial will demonstrate that the dominant cause of the losses suffered by the Plaintiffs are the Closure Orders – and therefore, under the appropriate construction of the virus exclusion, the purported exclusion cannot apply.

90.     Additionally, the virus exclusion is overly broad and violates public policy.  It is against public policy for an Illinois-licensed insurance carrier such as West Bend to exercise the privilege of collecting premiums in Illinois in exchange for such broadly-worded and sold "all risk" coverages and then attempt to exclude coverage on the ill-based, cursory and conclusory arguments Defendant has interposed in denying Plaintiffs coverage.

91.     Defendant's reliance on any purported virus exclusion fails.

## CLAIMS BY PLAINTIFFS: OVERVIEW

92.     The conduct set forth at length above constitutes Defendant's breach of the Policy contract.  Plaintiffs have sustained damages as a result of that breach, in the form of substantial Business Income losses and damage that continue to mount, including Extra Expense.

93.     By engineering this scheme to avoid its obligations under the Policies, Defendant breached its contract and exhibited bad faith by putting itself at a tremendous economic advantage over practically all other American business enterprises who honor their contractual obligations and continue to carry this nation through the current crisis.  Defendant is retaining and lucratively investing claims dollars it would have to pay out, or premium dollars it would have to rebate, if it chose to follow the law.

94.     Defendant has engaged in consistent misconduct across its claims handling in this time of crisis.  Defendant's reflexive denial of claims by Plaintiffs and thousands of other insureds at their time of need is arbitrary and unreasonable, inconsistent with the facts and plain language of the Policies, and flies in the face of well-established science.

95. Defendant's denials were driven by a desire to preempt its own financial exposure to the economic fallout resulting from Closure Orders, rather than to initiate, as Defendant is obligated to do, a full and fair investigation of the claims and a careful review of the Policies Defendant sold in exchange for valuable premiums.

96. Defendant improperly shifted the burden on Plaintiffs to retain counsel, initiate litigation (such as this), and expend great time, money, and opportunity cost. Instead of taking care of its employees and struggling business, Plaintiffs have been forced to come to court to compel Defendant to honor its contractual obligations to each of them.

97. Plaintiffs file this lawsuit for a declaratory judgment establishing that they are entitled to receive the benefit of the insurance coverage they purchased, for indemnification of the business losses it has sustained, for breach of contract, and for bad faith claims handling under 215 ILCS 5/155 – which entitles Plaintiffs to penalties and attorneys' fees. Alternatively, Plaintiffs, on behalf of themselves and all others similarly situated, choose to stand up against Defendant who would (as alluded to above) "have its cake and eat it too" and be unjustly enriched by retaining premium dollars it should disgorge if Defendant prevails on its coverage denials (Count IV, unjust enrichment). This same conduct also violated the Illinois Consumer Fraud and Deceptive Business Practices Act and the similar laws of other states where Defendant sells insurance. (Count V). Fed. R Civ. P. 8(d)(2), (3).

**COUNT I**
**DECLARATORY JUDGMENT**

98. Plaintiffs incorporate by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 to 97 above.

99. The Policies are insurance contracts under which Plaintiffs paid premiums in exchange for Defendant's promise to pay losses and damages for claims covered by the Policies,

including, but not limited to, Business Income losses and losses incurred as a result of the Closure Orders that forced Plaintiffs to close their businesses.

100.    Plaintiffs have complied with all applicable provisions of their respective Policies, including payment of the premiums in exchange for coverage under their Policies.

101.    Defendant has arbitrarily, unreasonably, and without justification refused to reimburse Plaintiffs for any losses and damages incurred in connection with the covered business losses set out at length above.

102.    An actual case or controversy exists regarding the Plaintiffs' rights and Defendant's obligations under their respective Policies to reimburse Plaintiffs for the full amount of losses and damages incurred by Plaintiffs.

103.    Pursuant to 28 U.S.C. § 2201, Plaintiffs seeks a declaratory judgment from this Court declaring the following: (a) Plaintiff Mashallah's losses and damages are insured under the Mashallah Policy; (b) Plaintiff Ranalli's losses and damages are insured under the Ranalli Policy; (c) Defendant has waived any right it may have had to assert defenses to coverage or otherwise to seek to bar or limit coverage for those losses and damages by issuing blanket coverage denials without conducting a claim investigation as required under Illinois law; and (d) Defendant is obligated to pay Plaintiffs for the full amount of the losses and damages incurred and to be incurred in connection with the covered business losses and damages up to the applicable limits of coverage.

**COUNT II**
**BREACH OF CONTRACT**

104.    Plaintiffs incorporate by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 to 103 above.

105.    The Mashallah Policy and Ranalli Policy are each insurance contracts under which Plaintiffs paid premiums in exchange for Defendant's promise to pay losses and damages for

claims covered by each of the Policies, including, but not limited to, Business Income losses and damages and losses and damages incurred as a result of the Closure Orders, as set forth at length above.

106.    Plaintiffs have complied with all applicable provisions of their respective Policies, including payment of the premiums in exchange for coverage, and yet Defendant has abrogated its insurance coverage obligations.

107.    By denying coverage for the business losses and damages incurred by Plaintiffs and set forth at length above, Defendant has breached its coverage obligations under the Policies.

108.    As a result of Defendant's breaches of the Mashallah Policy and Ranalli Policy, Plaintiffs have each sustained substantial damages for which Defendant is liable, in an amount to be established at trial.

<u>**COUNT III**</u>
**STATUTORY PENALTY FOR BAD FAITH DENIAL OF INSURANCE**

109.    Plaintiffs incorporate by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 to 108 above.

110.    Upon receipt of Plaintiffs' claims and (upon information and belief) upon receipt of each and every claim related to the Closure Orders, Defendant denied the claims, without conducting any investigation, let alone a "reasonable investigation based on all available information" as required under Illinois law.  *See* 215 ILCS 5/154.6.

111.    To make matters worse, based on information and belief, Defendant directed its insurance agents to send sham claims communications stating that Plaintiffs' claims were not covered.  Defendant formulated and executed on a plan to discourage policyholders such as Plaintiffs from submitting claim notifications in order to avoid any responsibility for its policyholders' staggering losses and damages, in violation of Illinois law.

112.    On information and belief, Defendant has also propagated rumor and innuendo that a purported government bailout of business income claims may occur, further to discourage claims.

113.    Defendant's denials were vexatious and unreasonable.  Defendant's actions disregarded or ignored facts underlying the claims, ignored the law, and ignored the science designed to save human life.

114.    Defendant's denials constitute "improper claims practices" under Illinois law – namely Defendant's: (1) refusal to pay Plaintiffs' claims without conducting reasonable investigations based on all available information; and (2) failure to provide reasonable and accurate explanations of the bases in its denials.  *See* 215 ILCS 5/154.6 (h), (n).

115.    Defendant has neither offered any justifiable reason for its denials, nor raised any bona fide disputes as to the whether the claims were covered.

116.    Therefore, pursuant to 215 ILCS 5/155, Plaintiffs request that, in addition to entering a judgment in favor of Plaintiffs and against Defendant for the amount owed under their respective Policies at the time of judgment, the Court enter a judgment in favor of each Plaintiff for an amount equal to the greater of: (1) 60% of the amount which the trier of fact finds that Plaintiff(s) is/are entitled to recover under their respective Policies, exclusive of costs; and (2) $60,000.  *See* 215 ILCS 5/155.

Plaintiffs further request that the Court enter a judgment in favor of Plaintiffs and against Defendant in an amount equal to the attorneys' fees and costs incurred by for the prosecution of this coverage action against Defendant, which amount will be proved at or after trial, pursuant to 215 ILCS 5/155.

## PRAYER FOR RELIEF ON COUNTS I - III

**WHEREFORE,** Plaintiffs Mashallah, Inc. and Ranalli's Park Ridge, LLC d/b/a Holt's pray that this Honorable Court enter an order and judgment in their favor and against Defendant West Bend Mutual Insurance Company as follows:

(a) Enter a declaratory judgment on Count I of the Complaint in favor of each Plaintiff and against Defendant declaring that: losses and damages by Plaintiffs incurred in connection with the Closure Orders and the necessary interruption of its businesses are insured losses and damages under their respective Policies; that Defendant has waived any right it may have had to assert defenses to coverage or otherwise seek to bar or limit coverage for the losses and damages of Plaintiffs by issuing blanket coverage denials without conducting a claim investigation as required under Illinois law; and that Defendant is obligated to pay Plaintiffs for the full amount of the losses and damages incurred and to be incurred in connection with the covered business losses and damages related to the Closure Orders;

(b) Enter a judgment on Count II of the Complaint in favor of each Plaintiff and against Defendant and award damages for breach of contract in an amount to be proven at trial;

(c) Enter a judgment on Count III of the Complaint in favor of each Plaintiff and against Defendant in the amount equal to the greater of (1) 60% of the amount which the trier of fact finds that Plaintiff is entitled to recover under the Policy, exclusive of costs; and (2) $60,000;

(d) Enter a judgment in favor of each Plaintiff and against Defendant in an amount equal to all attorneys' fees and related costs incurred for the prosecution of this coverage

action against Defendant pursuant to 215 ILCS 5/155, such amount to be established at the conclusion of this action;

(e) Award to each Plaintiff and against Defendant prejudgment interest, to be calculated according to law, to compensate it for the loss of use of funds caused by Defendant's wrongful refusal to pay Plaintiffs what it is rightfully owed under their respective Policies; and,

(f) Award Plaintiffs such other, further, and additional relief as this Court deems just and appropriate.

## COUNT IV (in the alternative)

## CLASS ACTION

**UNJUST ENRICHMENT BY COLLECTION/ RETENTION OF PREMIUM**

117. Plaintiffs incorporate by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 to 97 above.

118. Plaintiffs for themselves, and on behalf of all others similarly situated, allege this class action claim against Defendant in the alternative (see Fed. R. Civ. P. 8(d)(2), (3)) and as follows:

119. This is a class action count brought in diversity between the Plaintiff Class and Defendant, wherein jurisdiction lies under 28 U.S.C. § 1332.

120. If Defendant Insurer's denials of coverage for Plaintiffs' claims for business interruption coverage are upheld, then Defendant has been unjustly enriched in the amount of excess premium for business interruption coverage it has charged and retained while Plaintiffs' properties have been shut down or operationally impaired as the result of the Closure Orders. These premiums should be disgorged to all affected members of a class of Defendant's insureds, as set out below.

121. Defendant has priced and charged premiums for each of the Plaintiffs' respective Policies on the basis of their insured properties operating as fully functional business establishments. Accordingly, the insured risks included the prospect of having to pay claims for lost business income at levels commensurate with fully operational businesses, and for other risks (such as on liability insurance claims among others) commensurate with fully operational businesses.

122. During the time period while Plaintiffs' properties have been lost, damaged, shut down or otherwise operationally impaired by the Closure Orders, Defendant's risk of having to

31

pay other claims under their "all-risk" policies, including business interruption claims and others, has been reduced in many instances to zero and in all instances by substantial monetary amounts. Each of the Policies contain provisions making Defendant Insurers liable to pay business interruption loss only to the extent it would not have been incurred anyway, such as the provision taken below from the Mashallah policy:

> (c) Business Income means the: (i) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred . . . .
>
> Ex. A/ Mashallah Policy at p. 7 of 53.

123.    For example, if Plaintiffs' establishments were to suffer a total fire loss tomorrow, Defendant would decline to pay any business interruption loss that would have been incurred anyway as the result of the Closure Orders.

124.    Defendant knows all this, yet they have intentionally continued to charge and collect as "earned"—and Plaintiffs and the class have continued to pay including on renewals— premiums for which Defendant, according to its own self-serving justifications for denying coverage, assumed no commensurate risk.

125.    Defendant has been unjustly enriched, at Plaintiffs' and the Class' expense, and should be required to disgorge to Plaintiffs and each Class member the full amounts of excess premium for business interruption coverage and other coverages they have unlawfully charged, collected, and retained, as equity and good conscience require. Defendant's misconduct in this respect has been willful, wanton, and in bad faith.

126.    This action may properly be maintained as a class action pursuant to the provisions of Fed. R. Civ. P. 23(b)(1) and (3). Plaintiffs brings this action on behalf of themselves and on behalf of a Nationwide Class (as defined herein) of similarly situated businesses that have been irreparably harmed by Defendant, further defined as follows:

127.   This is a Nationwide Class of similarly situated persons defined as follows: all businesses in the United States who are insureds of Defendant under commercial insurance policies and who have experienced a complete or partial shutdown of their business operations as a result of a Closure Order issued by a State or local governmental authority on or after March 1, 2020, to the present.

128.   Excluded from this Class are (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Class; (4) any person who had their claims in this matter adjudicated and/or otherwise released; and, (5) the legal representatives, successors, and assigns of any such excluded person.

129.   This action is brought as a class action and may properly be so maintained pursuant to the provisions of Federal Rule of Civil Procedure 23(b)(1) and (3). Plaintiff reserves the right to modify the Nationwide Class and the class period pursuant to discovery that is conducted hereafter.

130.   Plaintiffs and all members of the Nationwide Class have been harmed by Defendant in a singular and common manner – they have been overcharged for premium for "all risk" commercial insurance policies and business interruption coverage during the current crisis, all to the unjust enrichment of Defendant.

131.   Numerosity: On information and belief, the Nationwide Class is so numerous that joinder of all individual plaintiffs is not practicable. The exact number of members of the Class is unknown and can only be ascertained through discovery because that information is exclusively within the possession, custody, and control of Defendant. However, on information and belief,

Plaintiff estimates that there are tens of thousands of potential Class members (if not hundreds of thousands) because Defendant sells commercial insurance in a number of states spanning the United States. Defendant is registered with the Illinois Department of Insurance and markets its policies to millions of Illinoisans and Illinois businesses, as well as in other states. The members of the Class can be identified easily through records maintained by Defendant and/or by other means.

132. <u>Commonality and Predominance</u>: There are questions of fact and law common to the Plaintiff and the Class members which predominate over any questions relating to individual class members. Some of the predominant, common questions include but are not necessarily limited to: 1) whether Defendant has been unjustly enriched in the amount of excess premium for "all risk" and business interruption coverage they have charged and retained while Plaintiff Class members' businesses have been shut down or operationally impaired as the result of Closure Orders; 2) whether Defendant has priced and charged premiums for Class members' policies on the basis of their properties operating as fully functioning businesses; 3) whether Defendant's risk of having to pay other commercial claims including business interruption claims has been reduced in many instances to zero and in all instances by substantial monetary amounts; 4) whether the Policies contain provisions making Defendant liable to pay business interruption loss and other claims only to the extent it would not have been incurred anyway; 5) whether Defendant has, knowing all this, continued to charge and collect as "earned" premiums for which Defendant, according to their own self-serving justifications for denying coverage, assumed no commensurate risk; and, 6) whether Defendant has, accordingly, been unjustly enriched.

133. <u>Adequacy of Representation</u>: Plaintiffs will fairly and adequately protect the interests of the Class members in that Plaintiffs' claims are typical of the Class and Plaintiffs do not have any interests which are adverse to the other class members. Plaintiffs' claims are based

on similar facts and the same legal theories as those of the Class members. Plaintiff has retained competent counsel, experienced in handling class actions, complex business transactions and litigating complex commercial disputes. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiff nor counsel have any interests which might cause them to not vigorously prosecute this action. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Nationwide Class.

134. <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the members of the Nationwide Class because Plaintiffs all paid premiums for "all risk" commercial insurance policies including business interruption insurance and were shut down by Closure Orders, yet were never refunded or rebated their premium by Defendant. Plaintiffs and all members of the Nationwide Class have thus similarly suffered harm arising from Defendant's violations of law as alleged herein.

135. <u>Appropriateness</u>: Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy described herein because it permits a large number of injured persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of evidence and effort. Class treatment is especially appropriate for the current controversy because it is the only practical means for Class members to receive redress given that the individual claims for refund of premium are likely not economically viable to pursue on an individual basis (as contrasted to their individual and sizeable business interruption claims, which Defendant, of course, has denied). The premium rebate damages suffered by each individual class member likely are disproportionate to the burden and expense of individual prosecution of complex and extensive litigation to proscribe Defendant's conduct and practices. The disposition of the claims in a class action will provide a substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits. A class action

provides the benefits of fewer management difficulties, single adjudication, economy of scale and comprehensive supervision by a single court, and would result in reduced time, effort, and expense for all parties and the Court, and ultimately ensure the uniformity of decisions.

## COUNT V (in the alternative)

## CLASS ACTION
### ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

136.    Plaintiffs incorporate by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 to 97, and 117 to 135 above.

137.    Plaintiffs for themselves, and on behalf of all others similarly situated, allege this class action claim against Defendant in the alternative (see Fed. R. Civ. P. 8(d)(2), (3)) and as follows:

138.    This is a class action count brought in diversity between the Plaintiff Class and Defendant, wherein jurisdiction lies under 28 U.S.C. § 1332. Plaintiffs incorporate by references, as if fully set forth herein, the class action allegations set forth in Count IV, above.

139.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* ("ICFA") and the similar laws of other states where Defendant sells insurance, provide protection to persons including Plaintiffs and the members of the Nationwide Class by mandating fair competition in commercial markets for goods and services.

140.    ICFA and the similar laws of other states where Defendants sell insurance prohibit any deceptive, unlawful, unfair or fraudulent business acts or practices using deception, fraud, false pretenses, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the employment of use of any deceptive practice described as a deceptive trade practice.

141.     Defendant is a "person" as defined by ICFA and the similar laws of other states where Defendant does business.

142.     Plaintiffs and each member of the Nationwide Class are persons protected by ICFA and similar laws of other states where Defendant does business.

143.     Defendant's sales of the Policies, collection of premiums, and administration of claims constitutes an activity covered by ICFA and similar laws of other states where Defendant does business.

144.     Defendant's retention and collection of full and undiscounted / unrebated premiums, including (but not limited to) upon renewal of policies, under the circumstances pled herein wherein the Defendant did not take on commensurate risk supporting those premiums, from businesses affected by Closure Orders, are deceptive and unfair acts or practices prohibited by ICFA and the similar laws of other states where Defendant does business.

145.     Defendant violated ICFA and the similar laws of other states where Defendant does business when it misrepresented and omitted facts regarding the premium charged (at a full and undiscounted / unrebated rate) and the commensurate risk actually taken on and the coverage actually afforded (including but not limited to that Defendant would not pay for business interruption losses for businesses whose income was already interrupted or reduced by Closure Orders).

146.     Defendant's conduct was knowing and intentional.

147.     Plaintiffs and members of the Nationwide Class relied upon Defendant's misrepresentations and omissions when they purchased, paid on, continued and renewed their Policies with Defendant.

148.     Defendant's misrepresentations and omissions pled herein were acts likely to mislead the Plaintiff and the Nationwide Class acting reasonably under the circumstances, and thus

constitute unfair and deceptive practices in violation of ICFA and the similar laws of other states where Defendant does business.

149.     As a direct and proximate result of Defendant's violation of ICFA and the similar laws of other states where Defendant does business, Plaintiffs and the members of the Nationwide Class have suffered harm in the form of excess premiums paid in exchange for their Policies, because they paid more premium than what they otherwise would have paid had they known the truth – that Defendant was not assuming risk commensurate with those premiums charged.

150.     Defendant's practices set forth herein offend public policy, were and are immoral, unethical, oppressive and unscrupulous, and cause substantial injury to Plaintiffs and the members of the Nationwide Class, who were protected by ICFA and the similar laws of other states where Defendant does business.

## **PRAYER FOR RELIEF ON COUNTS IV AND V (in the alternative)**

**WHEREFORE,** Plaintiffs Mashallah, Inc. and Ranalli's Park Ridge, LLC d/b/a Holt's, individually and on behalf of all persons similarly situated, pray that this Honorable Court enter an order and judgment in their favor and against Defendant West Bend Mutual Insurance Company as follows:

(a) Finding that this action satisfies the prerequisites for maintenance of a class action set forth in Fed. R. Civ. P. 23(b)(1) and (3), and certifying the Class as defined above;

(b) Designating Plaintiffs as the representatives of the Class and the undersigned counsel as Class Counsel;

(c) Entering judgment in favor of Plaintiffs and the Class and against Defendant on the unjust enrichment claim (Count IV) set forth above in an amount to be proven at trial;

(d) Entering judgment in favor of Plaintiffs and the Class and against Defendant on the claim for violation of ICFA and the similar laws of other states where Defendant does business (Count V), including compensatory damages and punitive damages as permitted by law and in an amount to be proven at trial;

(e) Awarding Plaintiffs and the Class pre-judgment interest, their court costs, expenses, and reasonable attorneys' fees; and,

(f) Awarding Plaintiffs any such other and further relief that this Court deems necessary and just.

## JURY DEMAND

Plaintiffs hereby demand trial by jury on all issues so triable.

Dated:  September 15, 2020

Respectfully Submitted,

FUKSA KHORSHID, LLC


*/s/ **William E. Meyer, Jr.***

William E. Meyer, Jr.

*Attorneys for Plaintiffs and for the Class*

FUKSA KHORSHID, LLC
William E. Meyer, Jr. (ARDC No. 6207345) of counsel
Lucas M. Fuksa (ARDC No. 6277498)
Lema A. Khorshid (ARDC No. 6283237)
Vincent P. Formica (ARDC No. 6319168)
200 W. Superior, Suite 410
Chicago, IL 60654
T: 312.266.2221
F: 312.266.2224
william@fklawfirm.com
lucas@fklawfirm.com
lema@fklawfirm.com
vince@fklawfirm.com